**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SHAWN E. NORTON, | No. CV 09-01358-PHX-MHM |
| Plaintiff, | **ORDER** |
| v. | |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Shawn Norton ("Plaintiff") seeks judicial review of the decision of the Commissioner of Social Security pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g). Upon judicial review by the Court, Plaintiff seeks for the Court to reverse the decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits and to remand solely for calculation and award of benefits. (Doc. 20). Currently before the Court is Defendant Michael J. Astrue's ("Defendant") motion to remand for further proceedings pursuant to sentence four of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). (Doc. 23). After considering the arguments set forth in the Parties' briefs, the record as a whole, and the applicable law, the Court issues the following order.

/ / /

# I.    PROCEDURAL HISTORY

On December 17, 2003, Plaintiff filed applications for Disability Insurance Benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433 and Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 1381-1383c.  (Administrative Record ("AR") 181-83).  He alleged that his disability onset date was May 1, 2000.  (AR 181).  Plaintiff's applications were denied initially (AR 148-51) and after reconsideration.  (AR 143-45).  On November 3, 2004, he requested an administrative hearing.  (AR 141).  A hearing was held before Administrative Law Judge ("ALJ") Edward T. Morris on April 26, 2005.  (AR 1420-55).  On March 7, 2006, the ALJ denied Plaintiff's application for Social Security Disability Insurance and Supplemental Security Income, finding that Plaintiff was not disabled.  (AR 97-106).  The Appeals Council granted Plaintiff's request for review of the ALJ's decision and remanded the claim for a new hearing and decision on August 10, 2007.  (AR 92-94).  A second hearing was held on May 19, 2008, before ALJ Morris.  (AR 1462-83).  In a decision dated June 26, 2008, the ALJ again found Plaintiff not disabled.  (AR 12-28).  The decision became the final decision of the Commissioner of Social Security when the Appeals Council denied Plaintiff's subsequent request for review on May 21, 2009, and again on July 14, 2009.  (AR 3-6).  On June 25, 2009, Plaintiff initiated the instant action for judicial review of the decision of the Commissioner of Social Security.  (Doc. 1).

# II.    BACKGROUND

## A.    Plaintiff's Background

Plaintiff was born in 1967 and was 32 years of age at the time of the alleged onset of disability.  (AR 1424).  Plaintiff served in the Navy from July 1989 to July 1993 and in the Army from January 1996 to May 2000.  (AR 170).  He worked as a radio mechanic and aircraft mechanic for the military prior to his onset date of disability.  (AR 1451-1452).  Plaintiff's physical health and mental health are summarized below.

/ / /

**1.      Physical Health**

In 1993, while serving in the military, Plaintiff fell approximately 20 feet from a helicopter. (AR 178). In 1998, Plaintiff was injured in the line of duty in Korea when he was dropped on his head while doing an exercise. (Id.). These two events and the demanding physical requirements of military service are alleged to have contributed to Plaintiff's current condition. (AR 178, 821).

Plaintiff has a long history of medical treatment for back and neck pain, headaches, migraines, and post-traumatic stress disorder. (AR 190-204, 207-210). He first obtained medical treatment for neck and shoulder pain in 1996 and for chronic low-back pain in 1998. (AR 190-204). In late 1999, Plaintiff was treated by an orthopaedic resident for neck and low-back pain. (AR 834). The doctor assessed him as having isolated chronic neck and back pain, likely to be derivative to degenerative changes in his cervical spine and dehydrated disc at L4-L5. (AR 836).

In February 2000, Dr. Wilkie evaluated Plaintiff for moderate/frequent headaches, back pain, and neck pain. (AR 821). Plaintiff reported constant 8 out of 10 back and neck pain, and stated that he had to stop working several days per week because of headaches, back pain, or neck pain. (AR 819-20). Dr. Wilkie recommended treatment of the headaches with prophylactic therapy and medication management, stating that there was not likely to be significant improvement. (AR 818). Plaintiff received repeat radiofrequency blocks at the Pain Management Center of the Medical College of Georgia on March 8, 2000, June 16, 2000, and October 20, 2000. (AR 1295, 1294, 1289).

On December 5, 2000, Plaintiff began treatment at the Veterans Affairs Medical Center ("VAMC") in Augusta, Georgia. (AR 1275). He reported constant sharp burning pain in the low-back that had grown progressively worse and was present 24 hours a day. (AR 1275). He reported treatment with numerous medications that did not provide relief. (AR 1278). He indicated that pain increased with bending, squatting, and prolonged sitting and standing. (Id.). He described associated symptoms of migraines, hand weakness,

1    occasionally dropping things, and pain radiating to his legs with numbness. (AR 1278). The

2    VAMC doctor diagnosed Plaintiff with neck and back pain.

3          In July 2001, Dr. Kumud Smith of the VAMC noted multiple areas of paraspinal

4    muscle spasm and tenderness. (AR 1238). Dr. Kumud Smith diagnosed chronic pain

5    secondary to herniated discs, performed trigger point injections of the lower back and right

6    upper cervical paraspinal region, and prescribed OxyContin, Darvocet, Valium, and Bentyl.

7    (AR 1238-39).

8          On August 27, 2001, Plaintiff underwent cervical spine surgery at the VAMC related

9    to a herniated disk at C5-6. (AR 1144).   The surgery entailed a C5-6 anterior cervical

10   discectomy and fusion with allograft and anterior cervical plate. (Id.).  Plaintiff returned to

11   the VAMC again in September 2001 and October 2001 for treatment associated with

12   headaches, neck symptoms, and back pain. (AR 1125-33). An examination of the Plaintiff

13   revealed he walked with a slight limp, used a cane, and suffered spasms of the neck.  The

14   VAMC doctor diagnosed Plaintiff with chronic low back pain with exacerbation and

15   prescribed Oxycodone and Valium. (AR 1128).

16         On December 19, 2001, John Downey at Augusta Pain Management began treatment

17   of Plaintiff. (AR 796). Up to that date, Plaintiff's treatment had included cervical surgery,

18   pelvic traction, physical therapy, trigger-point injections, osteopathic manipulation,

19   radiofrequency treatment, facet blocks, and a TENS unit.  (Id.). His medications were

20   OxyContin, Percocet, Valium, Imitrex, Neurontin, Flexeril, Amitriptyline, and Phenergan

21   (Id.).  During the visit, Dr. Downey treated Plaintiff with trigger-point injections and

22   osteopathic manipulation.  (AR 795).  Plaintiff continued to be seen for unchanged

23   complaints of neck and back pain and was given trigger-point injections and/or manipulation

24   of the spine during regular visits to Dr. Downey from December 2001 through July 2004.

25         In February 2003, a magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine

26   showed a lumbosacral transitional element, disc degeneration at L2-3, L4-5, and L5-S1 with

27   bilateral facet hypertrophy at L5-S1 and central broad-based disc protrusions at L4-5 and L5-

28

1   S1, as well as bulges at L2-3 and L3-4 with mild central canal stenosis at L4-5 and L5-S1.

2   (AR 1946).

3        On November 5, 2003, Luis Cedeño, a vocational rehabilitation counselor for the

4   Department of Veterans Affairs ("VA"), evaluated Plaintiff.  (AR 178-179).  Mr. Cedeño

5   noted in his report that Plaintiff applied for vocational rehabilitation in March 2000 but had

6   not been able to complete a single semester of schooling due to disability exacerbations,

7   which had been manifested in school attendance, periods of absences due to chronic pain and

8   side effects of medications.  (AR 179).  Mr. Cedeño found  that Plaintiff "will not benefit

9   from vocational rehabilitation services in which competitive employment is the goal" and

10  that "by virtue of his numerous service-connected disabilities incurred in the line of duty, he

11  is found to [be] infeasible" for participation in competitive employment activities.  (AR 179).

12       In April 2004, the VA evaluated Plaintiff's service-connected disabilities as 80%

13  disabling and determined that Plaintiff was unable to remain employed due to his service-

14  connected disabilities.   (AR 171).   As a result, the VA granted Plaintiff individual

15  unemployability compensation at the 100% rate effective April 2, 2004.[1]  (AR 168). The VA

16  based its decision on a finding that "[m]edical evidence shows you have severe complications

17  from your physical / mental disabilities." (AR 171).  The medical evidence evaluated by the

18  VA included treatment reports from Eisenhower Medical Center, Augusta Pain Center,

19  Southern Neurology Institute, an infeasibility statement from Vocational Rehabilitation and

20  Employment, and Plaintiff's VA Form 21-8940.  (Id.)

---

22  [1]Even if a veteran's service-connected disability rating is not 100%, VA benefits are
23  available to compensate veterans at the 100% level in the event that they are not able to work
    because of their service-connected disability/disabilities.  This benefit is called a total
24  ("100%") rating on the basis of individual unemployability due to service-connected
    disability and revolves around the inability to engage in "substantially gainful employment."
25  According to VA regulations, "all veterans who are unable to secure and follow a
    substantially gainful occupation by reason of service-connected disabilities shall be rated
26  totally disabled."  38 C.F.R. 416(a), (b).

That month, Dr. Wilson, a Disability Adjudication Services Medical Consultant, found, on the other hand, that Plaintiff had no significant motor, sensory, or reflex deficits and that Plaintiff had no significant atrophy or motor loss in the spine.  (AR 989).  Dr. Wilson noted that although Plaintiff's activities would be restricted, all activities would not be precluded.  (Id.)  Finally, he noted that although Plaintiff had occasional postural limitations, Plaintiff could stand and sit (with normal breaks) for about 6 hours in an 8-hour workday, could occasionally lift 20 pounds, and could frequently lift 10 pounds.  (AR 990, 993).

In October 2004, Dr. Lindaberry of Carolina Forest Family Medicine began treating Plaintiff and diagnosed depression, migraines, back pain, and muscle spasms. (AR 712). Dr. Linadberry performed trigger point injections in October 2004.  These injections continued to be performed every week through March 2005.

On referral from Dr. Lindaberry, Dr. Bangco began treating Plaintiff in February 2005 and diagnosed chronic pain syndrome.  In April 2005, Dr. Bangco and Dr. Downey both completed medical statements for Plaintiff's social security disability claim regarding headaches, chronic pain syndrome, low-back pain, and cervical spine disorders. (AR 665-72, 680-85, 688-89).  Both doctors noted the presence of neuron-anatomic distribution of pain, limitation of motion of the spine, motor loss, sensory or reflex loss, severe burning or painful dysesthesia, need to change position more than once every two hours, chronic pain, and weakness and inability to ambulate effectively.  (AR 669, 680).  They also found that Plaintiff suffered from severe pain and was limited to stand or sit no more than fifteen minutes at one time, and could not work even one hour a day.  (AR 669, 680).  They found that Plaintiff could not lift any weight and could never stoop and only occasionally bend. (AR 669, 680). The doctors assessed that Plaintiff was markedly limited in activities of daily living and social functioning, and had deficiencies in concentration, persistence, or pace due to pain.  (AR 667, 688).  Dr. Downey commented that Plaintiff has "severe pain that interferes with all aspects of his life."  (AR 688).

1    In October 2005, Plaintiff underwent a MRI of the lumbar spine and it showed
2 multilevel spondylosis. (AR 308-309). Then, in December 2005, Plaintiff underwent
3 another MRI of the cervical spine which showed left disc osteophyte complex and uncal
4 vertebral joint hypertrophy at C3-4 resulting in left neural foraminal stenosis with potential
5 irritation of existing left C4 nerve root. (AR 438).

6    On March 14, 2006, Dr. Lindaberry noted that Plaintiff required twenty-four hour
7 home care when his wife was not present and difficulty with ambulation and frequent falls.
8 (AR 618). On April 4, 2006, Dr. Lindaberry found that Plaintiff was unable to be employed
9 for the foreseeable future. (Id.). Dr. Lindaberry resumed Plaintiff's weekly trigger point
10 injections in April 2006. On July 27, 2007, Dr. Lindaberry completed a "Multiple
11 Impairment Questionnaire" and diagnosed neuromuscular dyskinesis, severe headaches, and
12 severe back pain. (AR 534). Clinical findings included an inability to stand, transfer to and
13 from his wheelchair without assistance, to tolerate light, and continued muscle spasms. (Id.).
14 The doctor rated Plaintiff's pain as moderate to severe. (AR 536). Dr. Lindaberry found that
15 Plaintiff could only sit less than one hour total and stand/walk less than one hour total in an
16 eight-hour workday. (Id.). It was noted that Plaintiff could never lift or carry any weight.
17 (AR 537). The doctor assessed significant limitations in doing repetitive reaching, handling,
18 fingering, or lifting due to neuromuscular dyskinesis, and marked limitations from grasping,
19 turning, and twisting objects, performing fine manipulation and reaching. (AR 537-36). It
20 was noted that Plaintiff's post-traumatic stress disorder ("PTSD") contributed to the severity
21 of his symptoms and functional limitations, and he was incapable of even low work stress.
22 (AR 539). Dr. Lindaberry stated that these symptoms and limitations detailed in the
23 questionnaire were present since June 2004. (AR 540).

24    Plaintiff continued receiving regular trigger-point injections from Dr. Lindaberry
25 through April 2008. An MRI of the cervical spine dated April 28, 2008 revealed multiple disc
26 level neural foraminal stenosis with disc osteophyte contacting the anterior surface of the
27 cord at C4-5 and C7-T1, annular tear at C7-T1 with increased degree of disc osteophytes, and
28 compression of the spinal cord since March 2005. (AR 430). An MRI of the lumbar spine

1   dated May 2008 showed multilevel spondylosis.  (AR 375-76).  Plaintiff continued seeking

2   medical treatment at the VAMC in Phoenix, Arizona in July 2008 after moving to the area.

3   (AR 1374-91).

4          **2.     Mental Health**

5          On January 19, 2001, Dr. Arena conducted a psychological intake of Plaintiff at the

6   VAMC and noted that it was "clear" that Plaintiff was very depressed and anxious.  (AR

7   1263).  Dr. Arena completed a detailed report following a second evaluation on July 2, 2001.

8   (AR 1231-35).  In the report, Plaintiff noted a history of psychiatric breakdowns and reported

9   nightmares from his combat experience in the Gulf War.  He reported being physically and

10  sexually abused.  (AR 1232-33).  A mental status examination revealed depression, memory

11  and concentration problems, moderate to severe signs of anxiety, mild stuttering, and severe

12  behavioral signs of pain.  (AR 1233-34).  Dr. Arena diagnosed chronic pain disorder

13  associated with psychological factors and a general medical condition, generalized anxiety

14  disorder, major depressive episode (recurrent, moderate), and personality disorder.  (AR

15  1235).

16         Dr. Sperr, a clinical psychologist, evaluated Plaintiff at the request of the

17  Administration on February 23, 2004.  (AR 998).  Plaintiff's mental status examination

18  revealed a lack of orientation to day of the month, depressed mood, variable effect from tense

19  to tears, and somewhat limited insight.  (AR 1000).  Plaintiff scored a verbal IQ of 79, but

20  was unable to complete the remainder of the testing due to problems with migraines and

21  vision during the assessment.  (Id.).  Dr. Sperr stated that Plaintiff's testing revealed he

22  operated in the borderline range of intellectual functioning, but was likely impaired due in

23  part to pain and emotional distress.  (AR 1002).  Dr. Sperr found that Plaintiffs symptoms

24  would significantly impair his ability to attend and concentrate on job tasks, maintain

25  consistency, and communicate and cooperate with job peers and supervisors, and could

26  likely preclude an ability to sustain a 40 hour work week.  Plaintiff was diagnosed with

27  PTSD, major depression (severe, recurrent), pain disorder associated with both psychological

28  factors and general medical condition, chronic neck and back pain, and migraines.  (Id.).

In April 2004, Dr. Susan Haverstock at the VAMC evaluated Plaintiff in a mental health consultation. (AR 918). Plaintiff stated he suffered from depression because pain has ruined his life and he cannot function. (Id.). He admitted to PTSD related to seeing Kurds get shot. (AR 919). Dr. Haverstock diagnosed pain disorder with physical and psychiatric components, depression secondary to general medical condition, personality disorder, and chronic back pain. (AR 919).

On month later, in May 2004, Dr. Coyle, a psychological consultant, conducted a Functional Capacity Assessment. (AR 981). Dr. Coyle found that Plaintiff had mild limitations of activities of daily living, moderate limitations in concentration and social functioning, and no episodes of decompensation. (Id.).

Dr. Fahy began seeing Plaintiff in February 2005 and diagnosed post traumatic stress disorder. (AR 719). In April 2005, Dr. Fahy completed a "Medical Statement Concerning Depression for Social Security Disability Claim." (AR 677-79). Dr. Fahy diagnosed chronic PTSD with a Global Assessment of Functioning ("GAF")[2] of 45. (AR 677). Dr. Fahy found that Plaintiff had *extreme* restriction when engaging in activities of daily living and difficulty in maintaining social functioning. (Id.). Specifically, Dr. Fahy found that Plaintiff was *extremely impaired* in his ability to perform activities, including the ability to maintain attention and concentration for extended periods, complete a normal workday without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (AR 678-79) (emphasis added). The doctor also found him *markedly impaired* in his social interactions, including his ability to

---

[2]A GAF is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Impairments, 4th text rev., 2000, p.32 (DSM-IV-TR). A GAF score of 51-60 is indicative of moderate symptoms, such as flat affect or occasional panic attacks, or any moderate difficulty in social, occupational, or school functioning. (Id.). A GAF score of 41-50 is indicative of serious symptoms, and a GAF score of 61-70 is indicative of mild symptoms. (Id.).

maintain socially appropriate behavior and to understand, remember, and carry out detailed instructions.  (AR 678) (emphasis added).

At Plaintiff's request, in a letter dated February 2006, Dr. Fahy noted that Plaintiff was confined to a wheelchair, unable to walk, suffered from PTSD as a result of his service in the Gulf War, and endured intractable migraine headaches.  (AR 357).  He indicated that Plaintiff required full time care. (Id.).  In June 2006, Dr. Fahy reported Plaintiff was very depressed, having high levels of anxiety, nightmares every night, and flashbacks every day. Dr. Fahy gave Plaintiff a GAF score of 50 in June 2007.  Five months later, in November 2007, Dr. Fahy completed a Psychiatric/Psychological Impairment Questionnaire.  (AR 606-13).  The doctor assessed a GAF score of 44.  (AR 606).  Dr. Fahy found that Plaintiff was markedly limited in all his daily mental activities.   (AR 607).  Dr. Fahy assessed that Plaintiff was incapable of even low stress work.  (AR 612).  He concluded that "[t]he combination of his physical and mental debility make for a severely disabled person." (AR 613).

In April 2008, Dr. Cusack evaluated Plaintiff and assessed PTSD by history, depression secondary to physical illness, anxiety disorder secondary to physical illness, cervicalgia, and migraines.  (AR 384-85).  Later that year, in October 2008, Plaintiff was seen at the VAMC's mental health clinic in Phoenix, Arizona.  (AR 1374).  The VAMC diagnosed Plaintiff with mood disorder, likely major depressive disorder ("MDD"), PTSD by history, and assessed a GAF score of 49.  (AR 1376).

**B.    Hearing Testimony**

At the April 26, 2005 hearing, Plaintiff testified that he spends most of the his day sleeping, tilted up watching TV, or taking a phone call, as he can not do anything except go to doctor appointments, which he attends roughly three times a week.  (AR 1426).  He stated that during his weekly doctor appointments he receives approximately 25 trigger points in his back and that he also attends a program for Persian Gulf PTSD on Thursday mornings. (AR 1426-27).  He testified that he had started using a cane but "my legs were still falling out from underneath . . . so then they moved me up for crutches," which he attested to have

been using for roughly three to four years. (AR 1430-31). He highlighted that he had sold his two story-house and moved to a condominium because he did not have the strength or energy to get up and down the stairs of his house. (AR 1435). He stated further that he was medically discharged from the military and that following the military he tried to go to school, but his grants for school were pulled because "I was missing too many days . . . because I was getting sick all the time." (AR 1436-37). He testified that his wife helps him get dressed, bathes him, and helps him with his medications. Plaintiff's wife corroborated this testimony by testifying that she has assisted with her husband's care for about four or five years and that on a good day she spends six hours caring for her husband. (AR 1444-45).

Dixon Pearsall, a vocational expert ("VE"), testified, in response to a hypothetical posed by the ALJ, that a hypothetical person who can perform light work and who has mild to moderate limitations in concentration and attention due to pain and the side effects of medication could perform the job of radio mechanic, but not the work of an aircraft mechanic. (AR 1452). The VE testified further that assuming the same elements of the first hypothetical, with the additional limitation of unscheduled work breaks totaling two hours for each eight-hour day, that the hypothetical person could not perform the job of radio mechanic. (AR 1453).

At the second hearing on May 19, 2008, Plaintiff testified that since his alleged onset date of disability in May 2000, he has worked only three weeks in 2003 as a headhunter, but did so from home, handling all of his work over the phone. (AR 1467-68). Plaintiff testified further that he has never had full relief of his neck and back pain, despite the fact that:

> I've tried everything. I've tried physical therapy. I've tried TENS units. I've tried heat pads. I've tried ice. I've tried trigger point injections I get now from Dr. Lindenberry . . . [he] does about 24 to 32 injections into my back. This is about three times a month if I can handle it . . . [i]t's the only thing that gives me, takes me from a level 9 or a level 10 down to about a level 7 pain where I live with everyday.

(AR 1472- 73).

He indicated that since May 2000, he has not been able to walk without an assistive device because "it's just . . . too painful." (AR 1477). He testified further that he is unable

1   to walk by himself and that "I always use my wife as something to lean upon or a crutch or
2   something to hold me up." (AR 1477).

3       **C .   ALJ's Conclusion**

4       On June 26, 2008, in his second decision on the matter, the ALJ denied Plaintiff's
5   claim for disability insurance benefits by following the requisite five-step sequential
6   evaluation process for determining whether an applicant is disabled under the Social Security
7   Act. See 20 CFR §§ 404.1520 and 416.920. (AR 15-23).

8       At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful
9   activity since the alleged disability onset date of May 1, 2000. (AR 18). At step two, the
10  ALJ concluded that Plaintiff had the following severe impairments: degenerative disc disease
11  of the lumbar and cervical spine, depression, and PTSD. (AR 17). However, at step three,
12  the ALJ concluded that Plaintiff's impairments did not meet or equal one of the listed
13  impairments set forth in Appendix 1 of the Regulations, 20 CFR Part 404, Subpart P,
14  Appendix 1. (AR 18). As the ALJ's analysis did not determine that Plaintiff's impairments
15  meet or medically equal the criteria of a listing, the ALJ proceeded to step four to determine
16  whether Plaintiff has the residual functional capacity to perform the requirements of his past
17  relevant work. At step four, the ALJ found that Plaintiff has the residual functional capacity
18  to perform the full range of light work, but that Plaintiff's depression and Post Traumatic
19  Stress Disorder "would limit him to unskilled work." (AR 19). Yet the ALJ found Plaintiff
20  unable to perform any of his past relevant work. (AR 22). As Plaintiff was found unable to
21  do any past relevant work, the ALJ proceeded to the fifth and last step to determine if
22  Plaintiff is able to do any other type of work. Upon consideration of Plaintiff's residual
23  functional capacity, age, education, and work experience, in conjunction with the Medical-
24  Vocational Guidelines, the ALJ concluded that there are jobs that exist in significant numbers
25  in the national economy that Plaintiff can perform. (AR 23). Accordingly, the ALJ
26  concluded that Plaintiff is not disabled under the Act. (Id.).

27  **III.   STANDARD OF REVIEW**

28

1    To qualify for disability insurance benefits, an applicant must establish that he is

2    unable to engage in substantial gainful activity due to a medically determinable physical or

3    mental impairment that has lasted or can be expected to last for a continuous period of not

4    less than 12 months.  See 42 U.S.C. § 1382c (a)(3)(A).  The applicant must also show that

5    he has a physical or mental impairment of such severity that the applicant is not only unable

6    to do her previous work, but cannot, considering her age, education, and work experience,

7    engage in any other kind of substantial gainful work which exists in the national economy.

8    Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989).  To determine whether an

9    applicant is eligible for disability insurance benefits, the ALJ must conduct the following

10   five-step sequential analysis:

11        (1)    determine whether the applicant is currently employed in
               substantial gainful activity;
12        (2)    determine whether the applicant has a medically severe
               impairment or combination of impairments;
13        (3)    determine whether the applicant's impairment equals one of a
               number of listed impairments that the Commissioner
14             acknowledges as so severe as to preclude the applicant from
               engaging in substantial gainful activity;
15        (4)    if the applicant's impairment does not equal one of the listed
               impairments, determine whether the applicant is capable of
16             performing his or her past relevant work;
          (5)    if not, determine whether the applicant is able to perform other
17             work that exists in substantial numbers in the national economy.

18   20 CFR §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987).

19        The Court must affirm an ALJ's findings of fact if they are supported by substantial

20   evidence and free from reversible legal error.  See 42 U.S.C. 405(g); see also Ukolov v.

21   Barnhart, 420 F.3d 1002, 1004 (9th Cir. 2005).  Substantial evidence means "more than a

22   mere scintilla," but less than a preponderance, i.e., "such relevant evidence as a reasonable

23   mind might accept as adequate to support a conclusion."  See, e.g., Sandgathe v. Chater, 108

24   F.3d 978, 980 (9th Cir. 1997); Clem v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990).

25        In determining whether substantial evidence supports a decision, the record as a whole

26   must be considered, weighing both the evidence that supports and the evidence that detracts

27   from the ALJ's conclusion.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); see also

28   Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993).  Nonetheless, "[i]t is for the ALJ,

- 13 -

1    not the courts, to resolve ambiguities and conflicts in the medical testimony and evidence."

2    Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations and internal quotation

3    marks omitted).  The ALJ may draw inferences logically flowing from the evidence, and

4    "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's

5    conclusion which must be upheld."  Id. (citation omitted).  Regardless, "[i]f the evidence can

6    support either affirming or reversing the ALJ's conclusion, [then the Court] may not

7    substitute [its] judgment for that of the ALJ."  Robbins v. Social Sec. Admin., 466 F.3d 880,

8    882 (9th Cir. 2006).

9    **IV.    DISCUSSION**

10           Plaintiff contends that the ALJ erred by (1) failing to properly consider that Plaintiff

11   was *per se* disabled under the Medical Listings at 20 C.F.R. Part 404, Subpart P, Appendix

12   1; (2) failing to follow the treating physician rule, including failing to evaluate the

13   Department of Veterans Affairs' ("VA") April 2004 disability rating; (3) failing to properly

14   evaluate Mr. Norton's credibility; and (4) failing to properly apply the Medical-Vocational

15   Guidelines.  (Doc. 20).  Defendant concedes that the ALJ erred, but only with respect to the

16   failure to evaluate the VA's disability rating.  (Doc. 23).  As the ALJ's failure to evaluate the

17   VA's disability rating constitutes  legal error, the Court reverses the ALJ's decision on this

18   ground and does not reach the other grounds of error asserted by Plaintiff.

19           **A. The ALJ erred in evaluating the Veterans Affairs April 2004 Disability Rating**

20           In April 2004, the VA evaluated Plaintiff's service-connected disabilities as 80%

21   disabling and determined that Plaintiff was unable to remain employed due to his  service-

22   connected disabilities.   (AR 171).   As a result, the VA granted Plaintiff individual

23   unemployability compensation at the 100% rate.  (AR 168–172).

24           In McCartey v. Massanari, the Ninth Circuit held that "although a VA rating of

25   disability does not necessarily compel the SSA to reach an identical result, the ALJ must

26   consider the VA's finding in reaching his decision." 298 F.3d 1072, 1076 (9th Cir. 2002)

27   (reversing a denial of benefits because the ALJ "failed to consider the VA finding and did

28   not mention it in his opinion").  The Ninth Circuit held further that "an ALJ must ordinarily

give great weight to a VA determination of disability."  Id.  However, because the VA and Social Security Administration criteria for determining disability are not identical, the ALJ may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record.  Id.

Here, the ALJ failed to properly evaluate the Plaintiff's VA's disability rating in his decision, a fact that Defendant concedes.  (Doc. 23) ("Commissioner concedes only that the ALJ erred in evaluating the VA rating.").  Although the ALJ was cognizant of the fact that "there is evidence in the record that the claimant has a 100% service-connected disability due to his cervical injuries," (AR 36-37), the ALJ did not state any "persuasive, specific, valid reasons" for what weight, if any, he gave to the VA disability rating.  Instead, the ALJ merely stated that "I am not bound by any disability determination of another agency."  (AR 36).  Accordingly, the Court holds that the ALJ's failure to consider Plaintiff's VA disability rating in reaching his decision constitutes legal error.  The Commissioner's decision, therefore, must be reversed and remanded.

The question of whether to remand a case for additional evidence and findings, or simply to award benefits, is a matter for the Court's discretion.  McCartey, 298 F.3d at 1076 (citing Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996) ("We have discretion to remand a case either for additional evidence and findings or for an award of benefits.")).  The Ninth Circuit has held that evidence should be credited and an immediate award of benefits directed, where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000) (quoting Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996)).  This test recognizes the "importance of expediting disability claims." Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  It also furthers "the primary purpose of the Social Security Act, 'to give financial assistance to disabled persons because they are without the ability to sustain themselves.'"  Id.  A Court may direct an award of benefits where remand would

1   unnecessarily delay the receipt of benefits.  Such a remand for benefits is particularly

2   appropriate where a claimant has already experienced lengthy, burdensome litigation.  Terry

3   v. Sullivan, 903 F.2d 1273, 1280 (9th Cir. 1990).

4           Here, the parties do not contest that the ALJ failed to provide legally sufficient

5   reasons for rejecting the VA's disability rating.  Therefore, the first prong of the test is

6   satisfied.  Next, there are no outstanding issues that must be resolved before a determination

7   of disability can be made because the VA disability rating speaks directly to whether Plaintiff

8   is disabled.  Finally, under the third prong of the test, the Court finds that the evidence in the

9   record does not outweigh the "great weight" that must be afforded to the VA's disability

10  rating that Plaintiff is disabled and unable to work due to his service-connected disabilities.

11  As such, it is clear that the ALJ would be required to find Plaintiff disabled.

12          In arriving at this conclusion, the Court notes that it disagrees with the ALJ's

13  interpretation of Plaintiff's credibility.  The ALJ determined that Plaintiff's statements

14  concerning the intensity, persistence and limiting effects of his symptoms were not credible

15  and inconsistent with the residual functional capacity assessment. When making a credibility

16  determination, it is true that "[a]n ALJ is not required to believe every allegation of disabling

17  pain or other non-exertional impairment."  Orn, 495 F.3d at 635.  However, if the medical

18  evidence establishes an objective basis for some degree of pain and related symptoms, and

19  there is no evidence affirmatively suggesting that the claimant was malingering, then the

20  ALJ's reason for rejecting Plaintiff's testimony must be clear and convincing and supported

21  by specific findings.  See Social Security Ruling 96-7 (stating that adverse credibility

22  determinations must be sufficiently specific to make clear to any subsequent reviewers the

23  weight the adjudicator gave to the individual's statements and the reasons for that weight).

24  Dodrill v. Shalala, 12 F.3d 915, 917 (9th Cir. 1993).

25           Here, the ALJ pointed out inconsistencies in Plaintiff's statements and testimony by

26  noting that "the only significant treatment that [Plaintiff] has received has been

27  radiofrequency ablation of the lumbar spine and an anterior cervical discectomy in August

28

2001." (AR 20). However, in reviewing the record as a whole, the Court finds substantial evidence that detracts from the ALJ's conclusion with respect to Plaintiff's credibility. The Court notes for example that Plaintiff also treated his symptoms with pelvic traction, physical therapy, frequent and regular trigger-point injections, osteopathic manipulation, facet blocks, a TENS unit, a Fentanyl patch, and a morphine pump. (AR 796, 1445, 1473). In addition, Plaintiff testified in April 2005 that,

> "they call me a high risk candidate for doing anything else . . . that you would have to cut me so many times [in] the same areas to fix the different joints or the facet area and all that, that it causes even more pain and more inability to do anything."

(AR 1430). He also testified to being on "very significant medications" for his various conditions, (AR 1432), and the record indicates that Plaintiffs has been prescribed numerous prescription medications to treat pain, migraines, and muscle spasms, including OxyContin, Hydrocodone, Percocet, Valium, Morphine, Imitrex, Duragesic, Neurontin, Flexeril, Marcaine and Lidocaine. (AR 178, 796, 1427).

The ALJ further discredited Plaintiff's credibility by noting that the surgery that Plaintiff underwent in August 2001 was "generally successful in relieving the claimant's symptoms." (AR 20). To support his finding, the ALJ cited x-rays taken in October 2001 and November 2006, which document a "solid appearing cervical fusion with intact hardware." (Id.). These findings appear contrary to the record, as Plaintiff testified that the surgery did not work and did not solve his underlying problems:

> Q: Are many of the symptoms you're describing attributable to the surgery not solving the underlying problems? You had surgery. Evidently it didn't work.
> A: Yes, sir.
> Q: Is that correct?
> A: Yes, sir.

(AR 1429). There is also substantial evidence in the record that demonstrates that despite the surgery, Plaintiff continues to suffer from spinal problems and associated symptoms.

See e.g., (AR 308-309) (indicating that a October 2005 MRI showed multilevel spondylosis of the lumbar spine); (AR 438) (noting that a December 2005 MRI showed disc osteophyte complex and uncal veterbral joint hypertrophy of the cervical spine resulting in neural foraminal stenosis); and (AR 375-76) (indicating that a May 2008 MRI showed multilevel spondylosis of the lumbar spine).

Next, the ALJ discredited Plaintiff's credibility by indicating that "claimant probably exaggerated a physiological tremor in August 2005." (AR 21). However, upon a review of the medical record, the Court finds that the ALJ's finding appears to be taken out of context. The record indicates that "No tremor seen on exam. By history, this is a fine postural tremor, brought out by stress, pain and anxiety. probably exaggerated physiological tremor; no need to intervene." (AR 336). Taken in context, the medical record does not explicitly indicate that the Plaintiff himself exaggerated about his tremor, but rather appears to speak to Plaintiff's type of physiological tremor.[3]

In addition, the ALJ found that "[i]n May 2008, records note that the claimant did not identify a traumatic event connected to his alleged post traumatic stress disorder condition." (AR 21). While the record supports this finding as to this particular doctor visit (AR 363), in considering the record as a whole, the Court notes that in April 2004 Plaintiff attributed his PTSD to "seeing Kurds get shot" (AR 919) and that during a medical examination in July 2001, he stated he "saw combat [during] the Gulf War and states that he still has nightmares from these experiences." (AR 1232). The record also indicates that Plaintiff was diagnosed with PTSD by multiple doctors. (AR 1002, 719, 364, 1376).

_____

[3] An exaggerated physiologic tremor is a mechanical reflex tremor. See Mark Hallett, MD., *Overview of Human Tremor Physiology*, 13 Movement Disorders, 43, 43-48 (2008)

The ALJ also questioned Plaintiff's credibility by highlighting that Plaintiff was injured while stepping out of a small boat in March 2004, "which is something a severely impaired person would not be likely to do," (AR 20), and noting that Plaintiff has reported "working on a computer for several hours, working on a lawn mower, traveling to Brazil for two months, eating out, which are not limited to the extent one would expect, given his complaints of disabling symptoms and limitations." (AR 21). The record shows that Plaintiff engaged in these activities. It also demonstrates that Plaintiff attended school for at least one year, held a job for three weeks, went to the store with his wife at least once a week, attended church, fished, and worked around the house.

This Circuit has made clear, however, that the mere fact that a claimant engages in daily activities such as grocery shopping and driving a car "does not in any way detract from [his] credibility as to [his] overall disability." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001). "The Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities are not easily transferrable to what might be the more grueling environment of the workplace[.]" Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Several courts, including [this Circuit], have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citations omitted). An ALJ may reject testimony based on daily activities where the ALJ makes specific findings that those activities are transferable to the work setting. See Fair, 885 F.2d at 603; Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007).

Here, the ALJ failed to explain in his decision how Plaintiff's daily activities translate into an ability to perform in a work setting. In addition, the ALJ lists Plaintiff's activities but fails to account for the limitations encountered by Plaintiff when engaging in these activities. The record, considered as a whole and in the proper context, demonstrates that Plaintiff experienced significant limitations when engaging in his daily activities. In a Social Security Administration Function Report, Plaintiff indicated that he attends church

once a month, yet "leaves early because I can't sit to[o] long[,] my back goes into spasms." (AR 803). While Plaintiff disclosed in a medical report that he worked in front of the computer for four hours, (AR 1039), he also stated he developed a right-sided headache after engaging in this activity. (Id.). Plaintiff testified that he held a part-time job as a headhunter for three weeks in 2003, yet medical records indicate that he was not able to continue work because of pain. (AR 791). Plaintiff disclosed that mowing the lawn made his low back pain worse. (AR 1027). The record also shows that he attended school, but "had to stop due to his pain and physical problems." (AR 1001, 1233). Finally, Plaintiff testified that he does not do any household chores because he can't bend down and "if I make a mistake . . . I pay for it with my life, three to four days in the bedroom." (AR 1438). The Court, therefore, does not agree with the ALJ's findings concerning Plaintiff's credibility as to the intensity, persistence, and limiting effects of Plaintiff's symptoms, finding instead that the record supports Plaintiff's testimony.

With respect to the opinions of the treating physicians, the ALJ gave little weight to Dr. Speer's opinion that Plaintiff's symptoms of PTSD and depression would preclude work on a full-time basis; to Dr. Fahy's assessment regarding Plaintiff's extensive limitations in daily living and social functioning; to Dr. Lindaberry's restrictive assessment; to Dr. Bangco's assessment of Plaintiff's marked restrictions of activities of daily living and social functioning; and to Dr. Downey's assessment of severe pain. (AR 21-22, 35). On the other hand, the ALJ afforded significant weight to the Disability Determination Services ("DDS") medical consultants. (AR 22). Nonetheless, in light of the "great weight" that must be afforded to the VA disability rating that Plaintiff is disabled and unable to work due to service-connected disabilities and the Court's determination that the record supports that the Plaintiff is credible, the weight afforded to the DDS medical consultants fails to overcome the "great weight" of the VA's disability rating.

In light of the foregoing, the Court finds that the evidence presented by the ALJ with respect to Plaintiff's credibility and the opinion evidence does not dispel the "great weight"

of the VA's disability rating that Plaintiff is disabled and unable to work due to a service-connected disability.  Consequently, the Court finds the ALJ would be required to find the claimant disabled and must, under the three-part test, remand for an award of benefits.  In so doing, the Court notes that further administrative proceedings would unnecessarily extend Plaintiff's long wait for benefits.  Remanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to "tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand."  <u>Varney</u>, 859 F.2d at 1398.  Plaintiff has waited over six years for his disability determination, a period that has previously been delayed as a result of a remand by the Appeals Council due to errors committed by the ALJ in his first decision.   (AR 92-94).  Additional proceedings would only delay Plaintiff's entitlement to benefits.   In light of these considerations, the Court reverses the Commissioner's decision to deny Plaintiff disability benefits and remands for a calculation of benefits.

## V.    SUMMARY

The Court finds that the ALJ improperly disregarded the VA's disability rating that Plaintiff is unable to work due to a service-connected disability.  As such, the ALJ's decision constitutes legal error and must be reversed.  The Court, credits the evidence and remands for an award of benefits as the ALJ has failed to provide legally sufficient reasons for rejecting the evidence, no outstanding issues remain that must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find Plaintiff disabled were the rejected evidence credited.

**Accordingly,**

**IT IS HEREBY ORDERED** reversing the Commissioner of Social Security's decision to deny Plaintiff disability benefits.

1   **IT IS FURTHER ORDERED** that Defendant's motion to remand for further

2   proceedings is DENIED.  (Doc. 23).

3   **IT IS FURTHER ORDERED** remanding the case to the ALJ for a finding of

4   disability and a calculation of benefits from May 1, 2000, the onset date of disability.

5   **IT IS FURTHER ORDERED** directing the Clerk of the Court to enter judgment

6   accordingly.

7   DATED this 27th day of September, 2010.



Mary H. Murguia
United States District Judge